# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

**RHONDA SUZZETTE BURNS,**

    **Plaintiff,**

**vs.**                          **CIVIL ACTION NO. 2:17-CV-01543**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

    **Defendant.**

## <u>PROPOSED FINDINGS AND RECOMMENDATION</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered March 7, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 16 and 17.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 16.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 17.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Rhonda Suzzette Burns (hereinafter referred to as "Claimant"), protectively filed her applications for Titles II and XVI benefits on March 21, 2014 and March 31, 2014, respectively, alleging disability since January 22, 2014, because of "anxiety, back pain, depression, and fibromyalgia".[1] (Tr. at 76, 273.) Her claims were initially denied on June 30, 2014 (Tr. at 100-101, 128-133.) and again upon reconsideration on September 2, 2014. (Tr. at 126-127, 139-145, 146-152.) Thereafter, Claimant filed a written request for hearing on September 18, 2014. (Tr. at 153-155.) An administrative hearing was held on August 12, 2015 before the Honorable John M. Dowling, Administrative Law Judge ("ALJ"). (Tr. at 35-75.) On August 21, 2015, the ALJ entered a decision finding Claimant had not been under a disability at any time from January 22, 2014 through the date of the decision. (Tr. at 14-34.) On September 23, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 12-13.) The ALJ's decision became the final decision of the Commissioner on January 4, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 1-8.)

On March 6, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings (Document No. 16.), and in response, the Commissioner filed a Brief in Support of

---

[1] In her Disability Report – Appeal, submitted on July 15, 2014, Claimant alleged that her depression and anxiety were worse, that she is unable to work and pay bills and had recently lost her father; she further stated that she was in pain. (Tr. at 306.) In a subsequent Disability Report – Appeal, submitted on September 18, 2014, Claimant alleged that her depression, anxiety and pain have all worsened, and that she developed a pinched nerve in her left arm, hand, and shoulder. (Tr. at 315.)

Defendant's Decision. (Document No. 17.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 40 years old as of the alleged onset date, and considered a "younger person", throughout the underlying proceeding. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 26.) Claimant obtained her bachelor's degree and master's degree in education from Marshall University; her primary past work consisted of working as an art teacher for students in kindergarten through six grade. (Tr. at 40-41, 440.) She quit working as an art teacher just before the Christmas break in December 2013 because of her back pain and inability to get out of bed. (Tr. at 40-42.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1

to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2018. (Tr. at 19, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of January 22, 2014. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: obesity; sleep apnea; and myofascial pain syndrome. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 22-23, Finding No. 4.) The ALJ then found that Claimant had

the residual functional capacity ("RFC") to perform sedentary work:

> except she can occasionally climb ramps or stairs and never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, and crouch, but never crawl. She must avoid concentrated exposure to extreme cold, excessive vibration, unprotected heights, and hazardous machinery.

(Tr. at 23, Finding No. 5.) At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr. at 26, Finding No. 6.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been under a disability from January 22, 2014 through the date of the decision. (Tr. at 27, Finding No. 11.)

## Claimant's Challenges to the Commissioner's Decision

Claimant has raised several grounds in support of her appeal. First, the ALJ erred by not considering the diagnoses and medical source statement provided by her treating therapist, Sarah Carrie Deutsch, a licensed social worker, because he found that she was not an acceptable medical source. (Document No. 16 at 8-9.) Second, the ALJ failed to properly consider Claimant's pain, which is well documented in the medical record. (Id. at 9-10.) Third, the ALJ neglected to consider Claimant's non-exertional impairments with respect to her ability to do work related activities, which Ms. Deutsch provided in her medical source statement. (Id. at 10-11.) Fourth, the ALJ's decision fails to mention whether he considered the combined or cumulative effects of Claimant's severe impairments on her ability to engage in substantial gainful activity, in contravention to this Circuit's case law.[3] (Id. at 11.) Fifth, the ALJ did not assess the effect of Claimant's obesity on

---

[3] Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974); DeLoatche v. Heckler, 715 F.2d 148, 154 (4th Cir. 1983).

her ability to sustain function over time pursuant to Social Security Ruling 96-8p. (Id. at 12.) Finally, Claimant asserts that the ALJ's decision is clearly wrong because the evidence showing her chronic back pain, anxiety and depression supports a finding for disability. (Id. at 12-13.)

Claimant asks that the final decision be reversed and she be found disabled, or in the alternative, that this matter be remanded so that the Commissioner can correct the errors below. (Id. at 14.)

In response, the Commissioner argues that the ALJ properly discounted Ms. Deutsch's opinion: she gave opinions on issues reserved to the Commissioner; as a non-physician, her opinion was never entitled to controlling weight; she gave opinions on Claimant's physical impairments that were outside of her field of expertise, mental health; she gave opinions that were inconsistent with her own treatment notes; and the evidence of record showed that Claimant continued to work after being diagnosed with anxiety, which indicated the impairment was not severe or disabling. (Document No. 17 at 12-15.)

The Commissioner also contends that the ALJ properly developed the RFC that accommodated the very physical impairments Claimant complained of, which was the result of a thorough and proper pain and credibility analysis. (Id. at 15.) The ALJ provided an extensive explanation why he found Claimant's allegations were not supported by the medical evidence and therefore not entirely credible. (Id. at 15-16.)

With regard to the RFC assessment and Ms. Deutsch's opinion, the ALJ properly evaluated the opinion and showed why it was not entitled to more weight than given. (Id. at 16-17.) With regard to Claimant's argument that the ALJ did not mention the combined effects of her severe impairments, the Commissioner contends that she is demonstrably incorrect, because the ALJ's

written decision demonstrates that he did consider these impairments in combination, in compliance with the pertinent Regulations, thus supporting the RFC as assessed. (Id. at 17-18.) With respect to Claimant's obesity, the ALJ considered this impairment and its limitations in his RFC finding, specifically referencing the medical documents indicating her reduced range of motion as a result, and further, her RFC was reduced to sedentary work to account for this impairment. (Id. at 18-19.) Finally, the Commissioner argues that Claimant's presumption of disability argument has no merit, because the substantial evidence supports the ALJ's conclusions, and further, judicial review does not include re-weighing the evidence. (Id. at 19.)

In sum, the Commissioner asks the Court to affirm the final decision. (Id. at 20.)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Claimant's Function Report:

In her Function Report dated May 8, 2014, Claimant reported that she could fold laundry, clean dishes and countertops, prepare meals, feed and care for her dog, drive, grocery shop, and handle finances. (Tr. at 296-298.) She had difficulties getting in and out of the shower and shaving her legs but would work on "bills, crafts, etc." while sitting at a table. (Tr. at 296.) Her hobbies included sewing, crafts, and couponing. (Tr. at 299.) She visited with friends and family in person, on the phone, and through the computer. (Id.) Claimant indicated that she did not need a walker, crutches, or a cane to walk. (Tr. at 301.)

Medical Records Prior to Alleged Onset Date:

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings, Claimant's mental impairments.

On July 30, 2002, Claimant underwent a breast reduction surgery by Michael R. Spindel, M.D. at St. Mary's Hospital to alleviate upper back pain. (Tr. at 455-456, 1029, 1039.)

From November 2010 through January 2012[5], Claimant sought treatment from Kelly Dick, M.A. and Samuel A. Januszkiewicz, M.D. at Marshall Psychiatry and Behavioral Medicine for depression and Post Traumatic Stress Syndrome. (Tr. at 1006-1026.)

Claimant also sought treatment at Lincoln Primary Care since June 2010, and she continued to treat through July 2015. (Tr. at 349-384, 405-432, 509-555, 558-561, 566-569, 573-587, 601-626, 845-892, 1205-1248.) A treatment note dated June 22, 2010 indicated that she treated with Michael Grome, PA-C with regard to her symptoms of back pain, depression, and anxiety/panic disorder. (Tr. at 511, 516.) He noted that she had seen a neurosurgeon, Dr. Werthiemer, for her back pain, and he did not feel she would benefit from surgery, and advised further physical therapy, or a pain clinic referral for back injections. (Tr. at 511.) Claimant reported that she wanted to maintain her "current care at this time as her pain has stabilized and no longer is radiating down her legs." (Id.)

On January 23, 2012, Mr. Grome referred her to physical therapy at Hamlin Physical Therapy. (Tr. at 554.)

Claimant attempted physical therapy at Hamlin Physical Therapy beginning in February 2012 through September 2012, and physical therapist Mike Kennedy noted that her central low back pain was worse with prolonged weight bearing postures. (Tr. at 555, 570-572.) On November 21, 2013, Greg S. Bowling, PT noted that her physical therapy was focused on back pain with acute lumbar sacral strain. (Tr. at 345-346.) He reported on December 16, 2013, that Claimant's

[5] During the initial appointment date of November 12, 2010, Dr. Januszkiewicz noted it was the "first appointment with [Claimant] in well over a year." (Tr. at 1025.)

pain was worse, she was not tolerating the exercises well, and she was primarily only receiving modalities. (Tr. at 347-348.)

By April 29, 2013, Claimant reported to Mr. Grome that she was experiencing panic attacks, her anxiety was increasing, and she requested to see a behavioral health counselor. (Tr. at 364.) With respect to her low back pain, she reported that she had been doing better, has good and bad days, although she was not doing her home exercise program as advised. (Id.) On November 4, 2013, Mr. Grome charted multiple tender points on palpitation of Claimant's upper to lower back. (Tr. at 374, 1209.) On December 19, 2013, Mr. Grome noted Claimant's depression symptoms had increased with her chronic low back pain, and the physical therapy made her low back pain worse. (Tr. at 1212.) Claimant also reported that her father was ill and in the hospital. (Tr. at 374.) Mr. Grome assessed lumbar/lumbosacral spine tenderness on palpitation, tender point on lumbar region and upper and outer buttocks. (Tr. at 1213.)

Treatment Records from Lincoln Primary Care, Michael Grome, PA-C:

Shortly after her alleged onset date, on February 7, 2014, Claimant complained of diarrhea and vomiting for the last four days. (Tr. at 376-377.) On examination, she was morbidly obese, ambulated normally, and was psychiatrically active, alert, and in a normal mood. (Tr. at 377.) She returned on February 17, 2014 for a follow-up visit with Mr. Grome. (Tr. at 417-420, 1219-1222.) Claimant again reported increased anxiety and depression due to her back pain and that her father was still ill and hospitalized. (Tr. at 418, 1220.) However, medication improved her symptoms. (Id.) On examination, Claimant's back pain was improving and was not radiating. (Id.) She experienced no radicular pain, but told Mr. Grome that physical therapy made her pain worse. (Id.) Her gait and station were normal, she had a negative seated straight leg-raising test, and her lower

extremity strength was intact. (Id.) Mr. Grome observed that Claimant was anxious, but she had good insight and judgment. (Id.)

During a March 2014 appointment, Claimant continued to report improved anxiety, depression, and "generalized pain" symptoms because of her medication. (Tr. at 421, 1228.) She reported stress as her father began chemotherapy and was still in the hospital, and she was seeing the behavioral health counselor. (Id.) On examination, Mr. Grome observed that Claimant was ambulating normally, she had a normal mood and affect, her reflexes and strength were normal and sensation was intact bilaterally. (Tr. at 421-422, 1228-1229.) However, because her low back pain worsened in the last three to four weeks, he referred Claimant to the Cabell Huntington Hospital Pain Center ("CHH") for her chronic pain syndrome/back pain. (Tr. at 422, 1230.) By May 2014, she again reported improvements in her anxiety and depression symptoms through medication although she continued to suffer from chronic low back pain and noted Celebrex does help "somewhat"; she was considering injections at CHH. (Tr. at 425, 1232.) Mr. Grome noted that her pain was not radiating, she had a negative straight leg test, normal station and gait, reflexes, sensation and strength were normal bilaterally, and again, her mood and affect were normal. (Tr. at 426, 1232-1234.)

On August 26, 2014, Claimant returned to Mr. Grome for a follow-up appointment. (Tr. at 1236-1239.) She reported that medication improved her anxiety, depression, and back pain. (Tr. at 1237.) She also reported that her back pain was non-radiating, but aggravated by flexing. (Id.) On examination, Claimant appeared well, walked normally, her mood and affect were normal, her gait and station were normal, although she had pain over her lower lumbar spine. (Tr. at 1238.)

On October 2, 2014, Claimant returned to Mr. Grome and reported "improvement in her

anxiety and depression" from her medication and therapy. (Tr. at 854, 1242.) She still had back pain, but it was not radiating. (Id.) On examination, she had a normal gait and station, had a normal mood and affect, and had tenderness over the lower lumbar spine. (Tr. at 854-855, 1242-1243.) Her BMI was 52.6. (Tr. at 850, 1242.) Treatment notes from November 2014 indicated Claimant's anxiety and depression remained improved, though she had bouts of insomnia since her father died (Tr. at 859.); Mr. Grome observed that she was ambulating normally, had a normal gait, mood and affect. (Tr. at 859-860.) By April 1, 2015, however, Claimant reported her anxiety and insomnia had worsened and that she had panic attacks during the daytime and possibly at night. (Tr. at 862-864.) Mr. Grome noted her Epworth sleepiness scale was within normal limits and instructed her to discontinue taking all bedtime medications, scheduled her for a nocturnal o2 saturation evaluation, and increased her Effexor dose. (Tr. at 864-866.) The results of the nocturnal o2 saturation study was abnormal, thus necessitating a sleep study. (Tr. at 867, 869, 870, 883-889.)

On May 26, 2015, Claimant underwent a sleep study with Imran T. Khawaja, M.D., who interpreted the results and assessed Claimant with moderate obstructive sleep apnea associated with oxygen desaturation, and a highly fragmented sleep pattern. (Tr. at 891-892.) Dr. Khawaja reported that Claimant had a BMI of 51 and "strongly" recommended that she lose weight. (Id.) He also recommended that Claimant return for a CPAP titration study. (Tr. at 892.) At an appointment with Mr. Grome on July 21, 2015, Claimant continued to complain of increased symptoms associated with anxiety and depression, with panic attacks during the day and possibly night, as well as more back pain. (Tr. at 1247.) She was unable to complete the CPAP study and had a follow up scheduled with a pulmonologist. (Id.) On examination, Claimant ambulated normally, had low back tenderness to palpation in SI region bilaterally and normal reflexes

bilaterally throughout. (Tr. at 1248.)

Cabell Huntington Hospital Pain Management Center:

Claimant began treating at CHH on May 16, 2014. (Tr. at 395-401, 1027-1033.) Joseph M. DeLapa, II, M.D. provided the initial consultation regarding for Claimant's chronic back pain and fibromyalgia. (Tr. at 395, 1027.) Dr. DeLapa reported that Claimant's lumbar spine x-rays were normal. (Tr. at 399, 405.) On examination, Claimant's lower extremities were normal, without pain or restriction upon movement. (Tr. at 400.) She had full (5/5) muscle strength, and her sensory and reflex examinations were normal. (Id.) Her straight leg testing was negative, and her Faber tests were positive. (Id.) She was normal psychologically and neurologically. (Id.) Dr. DeLapa diagnosed Claimant with myofascial pain syndrome, bilateral trochanteric bursitis, and lumbar spondylosis. (Id.) Dr. DeLapa recommended diagnostic and therapeutic blocks, such as Facet Medial Branch Nerve Block and Gluteal Bursa injection with ultrasound, however, Claimant expressed a fear of needles. (Tr. at 401.) Dr. DeLapa did not recommend physical therapy, but did recommend weight reduction. (Id.)

Claimant returned to CHH in August 2014, complaining of increased back pain. (Tr. at 403-404.) Aside from the increased pain, her examination results and diagnoses were unchanged. (Tr. at 403.) CHH personnel recommended that Claimant receive facet nerve block injections. (Tr. at 404.) On September 3, 2014, and September 22, 2014, Dr. DeLapa performed Diagnostic Facet Nerve Procedures/Lumbar (Medial Branch Procedure of Primary Dorsal Ramus), which Claimant tolerated well. (Tr. at 1049-1054.) During a follow up appointment on October 6, 2014, Claimant reported a 50% reduction in pain for three days after the first block, and a 75% reduction after the second block for three days, though she reported the blocks were "still working some today." (Tr.

at 1057.) On November 3, 2014, and November 13, 2014, Dr. DeLapa performed another Diagnostic Facet Nerve Procedures, Lumbar/Sacral (Medial Branch Procedure of Primary Dorsal Ramus). (Tr. at 1059-1063.) During another follow up appointment on November 26, 2014, she reported the same results; Dr. DeLapa requested bilateral radiofrequency of the lower lumbar facets. (Tr. at 1067.) A Progress Note dated January 15, 2015 indicated that Claimant reported her physical condition and functioning as "worse" and that her mood has also become "worse"; she had new complaints of spasms in her back and leg on the left side. (Tr. at 1068-1071.)

Nevertheless, Claimant had a left hip bursa injection on January 21, 2015 and a right hip bursa injection on March 12, 2015. (Tr. at 1072, 1074.) They did not provide relief, and Claimant continued to complain of lower back and hip pain, which increased with prolonged sitting or walking. (Tr. at 1079.) Next, on April 6, 2015, Dr. DeLapa performed a Lumbar Facet Rhizotomys (Neurolytic) of Medial Braches of Primary Dorsal Rami on Claimant's left side. (Tr. at 1081-1084.) At the follow up appointment on May 4, 2015, she reported no difference in her pain. (Tr. at 1086.) However, since a change in her medication, she stated that her mood was better. (Tr. at 1087.) A physical examination indicated that Claimant walked without a limp, was fully oriented, and her behavior was stable; her neurological examination was grossly intact. (Id.)

On May 20, 2015, Claimant underwent another left side bursa injection. (Tr. at 1089-1090.) A Progress Note dated June 29, 2015 indicated that Claimant still had pain, her mood had worsened, and her daughter was getting divorced. (Tr. at 1092.) It was also noted that Claimant had a new complaint of "bad headaches" which started in the middle of her forehead and ran to the base of her neck. (Id.)

Treatment Records from Allan S. Chamberlain, M.D.:

On July 24, 2014, Claimant had an annual check-up with Allan S. Chamberlain, M.D., (Tr. at 694-698.) Claimant reported that she had increased anxiety following her father's death. (Tr. at 694.) She also reported "having increased responsibilities with [her] mother and family". (Id.) On examination, she was in no acute distress, had no back tenderness, was normal neurologically, and had a non-dysphoric mood. (Tr. at 697-698.) Dr. Chamberlain noted that Claimant's depression was "well controlled" with medication, and that her "overall condition [was] good." (Tr. at 698.)

Treatment Records from Sarah Carrie Deutsch:

On March 17, 2015, Claimant attended a therapy session with Sarah Carrie Deutsch, a licensed clinical social worker/therapist. (Tr. at 451, 1192-1193.) Ms. Deutsch observed that Claimant had recently lost her father to cancer and that her boyfriend was being monitored for cancer. (Tr. at 1192.) Despite these stressors, Ms. Deutsch assessed Claimant with a Global Assessment of Function score of 70.[6] (Id.) On examination, Ms. Deutsch observed that Claimant's thought content was normal, she was fully oriented, her memory was intact, her cognitive function was intact, as were her judgment and insight. (Id.) Ms. Deutsch diagnosed Claimant with depressive disorder and recommended that she continue with therapy. (Id.)

The following day, on March 18, 2015, Ms. Deutsch provided a check box medical source statement concerning Claimant's mental capabilities. (Tr. at 449-451.) Ms. Deutsch checked boxes indicating that Claimant was moderately (i.e. more than slightly limited, but "still able to function

---

[6] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

satisfactorily") limited in her abilities to understand, remember, and carry out simple to complex instructions as well as in her abilities to make judgment on simple to complex work-related decisions. (Tr. at 449.) Ms. Deutsch provided support for this assessment by writing "[d]uring clinical interviews she has exhibited poor concentration and is easily distracted, which would interfere with her ability to complete job tasks successfully." (Id.) Ms. Deutsch also checked the boxes indicating that Claimant was moderately limited in her ability to interact appropriately with supervisors, co-workers, the public, and to respond to usual work situations and to changes in a routine work setting. (Tr. at 450.) In support of this opinion, Ms. Deutsch wrote that the "[c]linical interviews reveal she has great difficulty at times with interacting, such as when depressive symptoms are more severe – she is irritable and short fused." (Id.)

Ms. Deutsch also opined that Claimant was physically limited based on her review of Claimant's medical records from Lincoln Primary Care and CHH indicating chronic pain and exacerbating her psychological symptoms. (Id.)

On March 31, 2015, Claimant continued her therapy with Ms. Deutsch, who observed that she was less anxious. (Tr. at 1194.) On examination, Ms. Deutsch observed that Claimant's thought content was normal, she was fully oriented, her memory was intact, and her cognitive function, judgment, and insight were intact. (Id.) Claimant planned to work on relaxation techniques and again assessed with a GAF score of 70. (Tr. at 1194-1195.) Ms. Deutsch continued therapy with Claimant through August 2015. (Tr. at 1196-1204.) In each session, Ms. Deutsch examined Claimant and determined that her thought content was normal, she was fully oriented, and her memory, cognitive function, judgment, and insight were intact. (Tr. at 1196, 1198, 1201, 1203.)

In May 2015, she assessed Claimant with a GAF score of 75.[7] (Tr. at 1198.) On July 16, 2015, Ms. Deutsch assessed Claimant's depression as mild, there was no mention of anxiety, and Claimant's GAF score was 70. (Tr. at 1201.) On August 4, 2015, Ms. Deutsch observed that Claimant's depression had increased and assessed her with a GAF score of 68. (Tr. at 1203.) Ms. Deutsch commented that Claimant could not work due to her physical pain and emotional struggles. (Tr. at 1204.) Ms. Deutsch once again observed Claimant's thought content was normal, she was fully oriented, and her memory, cognitive function, judgment, and insight were intact. (Tr. at 1203.)

**The Opinion Evidence**

State Agency Psychological Consultants:

On June 20, 2014, Philip E. Comer, Ph.D. analyzed Claimant's records and determined that she had "the mental/emotional capacity for work like activity" provided her work environment accommodated her physical limitations. (Tr. at 81-82.) Specifically, Dr. Comer determined that Claimant had no episodes of decompensation and only mild limitations with respect to her activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace. (Tr. at 82.) On reconsideration, on August 27, 2014, Ann Logan, Ph.D., confirmed Dr. Comer's findings. (Tr. at 107-108.)

Mental Status Examination Report from Emily E. Watson, M.A.:

On June 11, 2014, Emily E. Watson, M.A., a licensed psychologist, conducted a consultative examination and prepared a mental status examination. (Tr. at 438-443.) Ms. Watson

---

[7] A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g. temporarily falling behind in schoolwork)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

observed Claimant to be attractive and well dressed in appearance, and was friendly and cooperative throughout the examination. (Tr. at 438.) Claimant reported that she could perform most activities of daily living independently, including grooming, hygiene, cleaning, chores, cooking, driving, shopping, and handling her own finances, though she admitted some difficulties putting on shoes, and usually wears flip-flops. (Tr. at 441.) Claimant continued to pursue her hobbies, including crocheting, painting, and drawing. (Id.) She used Facebook, cared for her dog, cut coupons, and did chores on a daily basis. (Id.)

On examination, Ms. Watson observed that Claimant had a normal posture and a slow gait. (Id.) She found Claimant was fully oriented, her speech relevant and coherent, her mood appropriate, her affect broad, and her thought process and content normal. (Id.) Her judgment was normal, insights were low, and immediate, recent, and remote memory were normal. (Id.) Claimant had mild concentration limitations, slow psychomotor activity, normal social functioning, and normal persistence and pace. (Tr. at 442.) Ms. Watson diagnosed Claimant with depressive and anxiety disorders, NOS. (Id.) Ms. Watson opined that Claimant had a fair to good prognosis provided she obtained "consistent and appropriate psychotropic and psychological intervention." (Id.)

State Agency Medical Consultants:

On June 28, 2014, James Binder, M.D. completed a physical RFC assessment. (Tr. at 83-85.) Dr. Binder concluded that Claimant was capable of light work with various postural limitations. (Tr. at 83-84.) Specifically, Dr. Binder concluded that Claimant could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; and could occasionally stoop, kneel, crouch, and crawl. (Tr. at 83.) On August 29, 2014, on reconsideration, Narenda

Pariskshak, M.D. examined the updated records and agreed with Dr. Binder's assessment. (Tr. at 109-111.)

<u>Internal Medicine Examination Report from Stephen Nutter, M.D.:</u>

On June 6, 2014, Stephen Nutter, M.D. conducted an internal medicine examination of Claimant. (Tr. at 433-437.) Claimant told Dr. Nutter she was unable to work because of her back pain and fibromyalgia; the onset of her back pain "was unable to be elicited." (Tr. at 433.) On examination, Dr. Nutter observed that Claimant was five feet five and a half inches tall, and weighed 322 pounds. (Tr. at 434.) She walked with a slow, limping gait and did not require an aid to walk. (<u>Id</u>.) Her station was stable (<u>Id</u>.) Claimant's intellectual functioning was normal, and her recent and remote memory were good. (<u>Id</u>.)

She had full (5/5) grip strength and could write and pick up coins without difficulty. (Tr. at 435.) Claimant's obesity reduced her range of motion in her lower extremities. (Tr. at 436.) She had pain on motion in her cervical and dorsolumbar spine, and a decreased range of motion, but no spasms. (Tr. at 436-437.) Claimant could stand on one leg without difficulty, but her bending was limited. (Tr. at 436.) Dr. Nutter found that Claimant had 4/5 strength in her upper extremities and limited elbow and hip flexion. (<u>Id</u>.) Her wrist flexion and extension were 5/5, and Claimant had no atrophy and normal reflexes. (<u>Id</u>.) Dr. Nutter observed that Claimant could not squat due to back pain, but could heel and toe walk, and could perform tandem gait. (Tr. at 437.) He diagnosed her with chronic back and neck pain, as well as diffuse arthralgia and myalgias (<u>Id</u>.)

Dr. Nutter found that Claimant had pain and tenderness in the cervical and dorsolumbar spine with decreased range of motion of the back and neck. (<u>Id</u>.) He opined that straight leg testing seems positive in the left leg and sensory testing was intact. (<u>Id</u>.) He further noted that Claimant

had "a lot of pain with movement today and could not squat." (<u>Id</u>.) Though Claimant had diffuse tenderness in her legs, wrists, elbows, knees and shoulders, Dr. Nutter found no evidence of rheumatoid arthritis, no rheumatoid nodules, capsular thickening, periarticular swelling or tophi, or ulnar deviation. (<u>Id</u>.)

## <u>The Administrative Hearing</u>

<u>Claimant Testimony:</u>

Claimant testified that before she went on personal leave from her work, she was calling in often and only worked two or three days a week. (Tr. at 41-42.) She stated that she could no longer work because there were some days she could not get out of bed or walk at all due to her back pain. (Tr. at 44.) She testified that she is not able to do sit down work because she cannot sit very long, and has to lay down three or four times a day. (<u>Id</u>.) Laying down is the only way she is able to get relief, not total relief, because it takes the pressure off her back. (<u>Id</u>.) Though she treated at the Pain Center for her back, she never saw an orthopedist for her back pain. (Tr. at 45.) Claimant recognized that her obesity aggravates her back and her providers were "always" talking to her about it. (Tr. at 46.) She estimated that she could stand for about ten minutes before she had to sit again. (<u>Id</u>.) She also estimated that it would be that long for standing before she had to sit down again. (Tr. at 47.) She did not think she could walk a block because she would have to stop and lean against something to take a break. (<u>Id</u>.) She described her back pain as radiating from her mid-back down to her legs and that standing or sitting too long or any movements makes it worse. (<u>Id</u>.)

With regard to her sleep apnea, Claimant testified that although she needed oxygen, her doctor could not write a prescription for it because of possible contraindications with her muscle relaxers. (Tr. at 48.)

Claimant also stated that due to her pain, she has difficulty concentrating, but her medications also cause her dizziness and sleepiness. (Tr. at 49.) Since she was taken off muscle relaxers, she testified that she gets more headaches and spams in her head, also, her neck hurts all the time. (<u>Id</u>.) Her pain starts in her head, goes down her neck and into her shoulder; the pain keeps her awake at night and makes her arms weak. (Tr. at 53.)

Claimant testified to emotional trauma because she had been molested, where she isolates herself and it triggers her anxiety. (Tr. at 50-51.) Usually these attacks last about five to ten minutes and it takes her from twenty to thirty minutes to straighten herself out. (Tr. at 51.) Claimant has experienced traumatic events with men: an ex-boyfriend raped her and her ex-husband held a knife to her throat; being around men trigger anxiety attacks. (Tr. at 51-52.) Claimant testified that she has flashbacks of these events several times a week that can be triggered by people, movies, or people's interactions with each other. (Tr. at 52-53.)

Claimant testified that it had been two years since her carpal tunnel release, and she was starting to drop things again with her right hand. (Tr. at 54.) She is unable to sew anymore because of shakiness and she is not able to write for very long. (<u>Id</u>.)

Claimant lives alone, and will "hang onto the walls" and usually makes simple meals for herself like sandwich or piece of fruit; she does not stand while cooking at the stove, she uses a chair. (Tr. at 55.) Some days she needs help dressing herself, and undressing, but she can undress enough to use the bathroom. (Tr. at 56.) She wears flip-flops because she cannot reach her feet to put on shoes. (Tr. at 56-57.) Usually she lays in bed all day, or watches TV. (Tr. at 57.) If she has to go somewhere, she needs to lay down and res after she gets out of the shower, and after she puts her clothes on. (<u>Id</u>.)

Claimant's daughter cleans her house and her mother pays her bills because she has no income and because she cannot concentrate. (Tr. at 58.) Claimant got rid of her dog because she could no longer take care of him. (Tr. at 58-59.) She does not go to church anymore because she cannot sit or concentrate on the preaching. (Tr. at 59.) Though she has trouble being around people, she was able to teach because being around kids was easier than being around adults. (Id.) She goes shopping with her mother, usually by hanging onto the buggy or using the personal mobile device, but her mother reaches to get the things she needs or unloading the buggy at the register. (Tr. at 59-60.)

In response to questioning by the ALJ, Claimant testified that in July 2014 when she had more responsibilities with her mother, she was taking care of the estate paperwork after her father died. (Tr. at 60-61.) Claimant's mother is also on disability and has many health problems, but she and Claimant help each other. (Tr. at 62.)

Anthony T. Michael, Jr., Vocational Expert ("VE") Testimony:

The ALJ provided a hypothetical to the VE regarding an individual with Claimant's age, education, and past work experience; who could perform work at the sedentary exertional level and occasionally climb, ramps, or stairs; but who could never climb ladders, ropes, or scaffolds; who could occasionally stoop, kneel, and crouch, but who could not crawl; and who must avoid concentrated exposure to extreme cold, excessive vibration, unprotected heights, and hazardous machinery. (Tr. at 64-65.) The VE confirmed that such an individual could perform work found in significant numbers in the national economy, including the jobs of retail order clerk and inspector. (Tr. at 66.) In response to questioning from Claimant's attorney, the VE testified that if the individual were limited to occasional handling, other sedentary jobs would be available such as

callout operator or surveillance system monitor. (Tr. at 71-72.) The VE explained that the jobs of retail order clerk, inspector, callout operator or surveillance system monitor are amenable to the individual who needed a sit/stand option, and though that is not specified under the Dictionary of Occupational Titles, it is based on the VE's education and professional experience. (Tr. at 68, 73.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**Analysis**

> The Evaluation of Opinion Evidence:

Claimant's first alleged ground(s) in support of her appeal, that the ALJ disregarded the diagnoses provided by her treating sources, and disregarded Ms. Deutsch's medical source statement and substituted his own because the ALJ found Ms. Deutsch to be a non-acceptable medical source. (Document No. 16 at 8.) As an initial matter, the undersigned notes that the Claimant does not specify which diagnoses the ALJ supposedly disregarded.[8] However, from the outset of the written decision, the ALJ expressly found

> that carpal tunnel syndrome, high blood pressure, bursitis, acid reflux, hernia, diverticulosis, irritable bowel syndrome, fibromyalgia, fatty liver, scoliosis, degenerative disc disease, peripheral neuropathy, peripheral vascular disease, and all other impairments besides those enumerated above, alleged and found in the record, are non-severe or not medically determinable as they have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to last at a "severe" level for a continuous period of 12 months, are not expected to result in death, or have not been properly diagnosed by an acceptable medical source.

(Tr. at 20.) The ALJ then proceeded to discuss the medical treatment Claimant received concerning her hypertension, neuropathies, carpal tunnel syndrome, her breathing issues, neuropathy, exertional limitations, and specifically discussed the effects obesity has on her exertional limitations, how certain diagnoses such as fibromyalgia were not established pursuant to SSR 12-2p and imaging of her lumbar spine were unremarkable. (Id.) Indeed, the ALJ noted that the medical evidence of record concerning many of Claimant's physical impairments indicated that they were mild at best. (Id.)

---

[8] Claimant argues in her third alleged ground of error that the ALJ disregarded her depression, anxiety, and post-traumatic stress disorder with regard to her ability to maintain employment, and focuses again on Ms. Deutsch's medical source statement. (Document No. 16 at 10-11.) However, as demonstrated by the ALJ's written decision, *supra*, this argument lacks merit. The undersigned addresses the ALJ's treatment of Ms. Deutsch's medical source statement opinion *infra*.

20 C.F.R. §§ 404.1527 and 416.927 govern the SSA's criteria for evaluating opinion evidence; per §§ 404.1527(a)(2), 416.927(a)(2):

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other ***acceptable medical sources*** that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions. (emphasis added)

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Under §§ 404.1527(c)(1) and 416.927(c)(1), more weight is given to a physician who examines a claimant than to a non-examining physician.

Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

In this case, the ALJ also discussed Claimant's medically determinable mental impairments of anxiety and depression, and found them nonsevere, but "also considered the claimant's features of dependent and borderline personality disorders as noted by the psychological consultative examiner and post-traumatic stress disorder." (Tr. at 20-21.) The ALJ then performed the "special technique", *supra*, with respect to Claimant's mental impairments, finding that Claimant's first three functional areas in activities of daily living, social functioning, and concentration, persistence

or pace to have mild limitations, and no episodes of decompensation. (Tr. at 21.) In addition to the opinion evidence provided by Ms. Watson and the State agency psychological consultants[9], the ALJ "has considered the opinions of Sarah Deutsch, LCSW, the claimant's treating therapist. (Exs. 12F; 33F/14)[]."[10] (Tr. at 22, 449-451, 1204.)

The ALJ then proceeded to review not only Ms. Deutsch's opinions with respect to Claimant's physical and emotional problems, but weighed this evidence, specifically finding: (1) that Ms. Deutsch's opinion that Claimant was unable to work a determination to be made by the Commissioner alone and undeserving of any special weight; (2) that the ALJ already determined that Claimant's mental impairments were nonsevere, and Ms. Deutsch's opinion to the contrary was entitled to "little weight"; (3) that Ms. Deutsch's opinion regarding Claimant's physical impairments are beyond her specialty as a mental health provider, and given "little weight"; and (4) that Ms. Deutsch's medical source statement is entitled to "little weight." (Tr. at 22.) The ALJ noted that Ms. Deutsch's treatment notes were inconsistent with the limitations she stated in her opinions, which demonstrated Claimant's mental impairments were mild or transient at times. (Id.) The ALJ gave "great weight" to the GAF scores Ms. Deutsch assessed Claimant during her treatment "to the extent they are consistent with the evidence." (Id.) It is also notable that the ALJ also found that Claimant "was treated for anxiety before her alleged onset date, when she worked at substantial gainful activity levels, with no significant worsening noted." (Tr. at 22, 374-375,

[9] The ALJ gave "great weight" to the opinion provided by Ms. Watson insofar as she opined Claimant's prognosis was fair to good provided Claimant obtained consistent and appropriate psychotropic and psychological intervention, noting that Claimant's treatment "showed improvement or exacerbations due to situational stressors such as illness of family members." (Tr. at 21, 380-384.) The ALJ also gave "great weight" to the opinions of the State agency psychological consultants that Claimant had mild or normal functional limitations in "paragraph B" criteria, finding they were supported by the records. (Tr. at 21-22.)

[10] The undersigned notes that later in his decision, the ALJ mentioned that he considered and weighed the opinion of "the claimant's treating therapist Sarah Deutsch, LCSW, and the claimant's GAF scores under finding three above." (Tr. at 25.)

406.)

In sum, the undersigned **FINDS** the Claimant's arguments with respect to her initial alleged ground of error lacks merit. Clearly, the ALJ considered Claimant's treating source diagnoses as well as opinions, weighed them accordingly, and provided a thorough explanation for the weights given to the opinion evidence. There is no indication that the ALJ "disregarded" Ms. Deutsch's medical source statement because she is considered a non-acceptable medical source. There is no dispute that Ms. Deutsch is not an acceptable medical source, and to that extent, the ALJ had no duty to consider her opinion pursuant to 20 C.F.R. §§ 404.1513(d), 416.913(d). Further, the ALJ also had no duty to give any special significance to Ms. Deutsch's opinion that Claimant's impairments precluded work, as such determinations are reserved to the Commissioner. See Id. §§ 404.1527(d)(3), 416.927(d)(3). Finally, there is no evidence whatsoever that the ALJ substituted his own opinion in lieu of medical source opinion.

Accordingly, the undersigned **FINDS** that the ALJ's consideration and evaluation of Ms. Deutsch's opinion evidence is supported by substantial evidence.

The Pain and Credibility Assessment:

Claimant contends the ALJ's consideration or disregard of her pain and credibility determination were improper. (Document No. 16 at 9.) It is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.") Nevertheless, Social Security Ruling

(SSR) 96-7p[11] provides clarification for adjudicators when evaluating a claimant's symptoms, including pain; 20 C.F.R. §§ 404.1529 and 416.929 require a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. 1996 WL 374186, at *1.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work. Id. *passim*. In accordance with Sections 404.1529 and 416.929, the Ruling provides seven factors that an ALJ must consider in addition to the objective medical evidence when assessing a claimant's credibility:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

---

[11] The undersigned is mindful that this Ruling has been superseded by SSR 16-3p, however, the previous Ruling was in effect at the time of the ALJ's decision, August 21, 2015.

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id., at *3.

After first performing the two-step process[12], the ALJ determined that Claimant's allegations concerning her pain were disproportionate to the evidence, noting that despite her reported difficulties with memory, completing tasks, and concentration, examination revealed that she had "good recent and remote memory for medical events, that she was alert, oriented, had stable behavioral patterns, and relevant and coherent speech. Exs. 9F; 30F/38-41)." (Tr. at 24, 433-437, 1064-1067.)[13] Further, with respect to Claimant's degenerative disc disease, her lumbar spine imaging in 2014 was unremarkable; Claimant had not seen an orthopedist about this impairment, a neurologist did not recommend surgery a few years earlier, and the record indicated that none of Claimant's providers recommended surgery. (Tr. at 24, 405.) Moreover, Claimant "told to her

---

[12] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).
[13] It is noted that the ALJ referenced Dr. Nutter's examination report and a Progress Note dated November 26, 2014 from CHH.

medical provider in 2014 that she had increased responsibilities with her mother and family, indicating greater function that alleged." (Tr. at 24, 694-698.) The ALJ summarized that the inconsistency between the objective medical record and Claimant's allegations "undermines the credibility of her reports." (Tr. at 24.)

After discussing Claimant's statements "though forms filled out for the Agency", her testimony, as well as the medical records related to both her alleged physical and mental conditions, described *supra*, the ALJ ultimately found that Claimant's allegations were not entirely credible. (Tr. at 23-24.) With respect to Claimant's "alleged pain, obesity, and sleep apnea, the record reveals that she has limitations consistent with the residual functional capacity found herein." (Tr. at 24.) In support of this determination, the ALJ then provided numerous examples from records provided by CHH and Lincoln Primary Care, as well as from Dr. Nutter's examination report. (Tr. at 24-25.) The ALJ also found that the record did not indicate Claimant had additional limitations: (1) Claimant "reported improvement in pain with medication and medication changes" (Tr. at 25, 382-384.); (2) Claimant reported difficulty walking, but "she has not been prescribed an assistive aid and has been observed to have normal gait and station by multiple providers" (Tr. at 25, 380, 384, 426, 850, 855, 860, 1057, 1066, 1086.); (3) Claimant's "lower extremity strength has remained intact and recorded as 5/5" (Tr. at 25, 380, 384, 400, 426.); (4) Claimant's sensation in her feet was intact upon examination (Tr. at 25, 384, 400, 426.); (5) Claimant's movement in her lower extremities "have been described as unrestricted and not painful" (Tr. at 25, 400.); and finally, (6) Dr. Nutter found Claimant's "grip strength intact at 5/5, her range of motion of the joints of her fingers as normal, contradicting the claimant's report of difficulty picking items up", but also that she did not appear uncomfortable sitting during the

examination and despite some neurological weakness demonstrated, Claimant still had 4/5 strength in her upper extremities with wrist flexion and extension being 5/5. (Tr. at 25, 433-437.) The ALJ resolved all these inconsistencies, and determined that he "is unable to find that the claimant is more limited than found in the residual functional capacity finding." (Tr. at 25.)

Interestingly, when the ALJ weighed the opinion evidence provided by State agency medical consultants, Drs. Binder and Parikshak, he only gave them "partial weight", specifically with respect to Claimant's exertional limitations. (Tr. at 25.) The ALJ explicitly found that Claimant was limited to sedentary work, not light work as found by the State agency consultants, because sedentary work was deemed to be more consistent with the evidence of record, as Claimant "has trigger points, pain with range of motion, tenderness in her legs, and reduced range of motion due to obesity." (Id.) Further, the ALJ "has given the claimant the benefit of the doubt in light of the objective evidence of limited range of motion and her obesity, and found more limitations in crawling than the State agency consultants." (Id.)

In sum, the ALJ's pain and credibility analysis and ultimate determinations demonstrate compliance with the Regulations and are evident that he applied the factors promulgated under the pertinent Ruling. As a result, the ALJ's pain assessment and credibility determination are amenable to judicial review; accordingly, the undersigned **FINDS** substantial evidence supports the ALJ's findings and conclusion with respect to Claimant's pain and credibility.

Moreover, to the extent Claimant argues that the ALJ failed to consider the combination of her severe impairments, including obesity, sleep apnea, and myofascial pain syndrome (Document No. 16 at 11.), the ALJ's thorough discussion concerning those physical impairments demonstrates that he did properly consider those impairments in combination, accordingly, the undersigned

further **FINDS** that Claimant's argument otherwise lacks merit.

Physical Impairments and SSR 96-8p:

Claimant also argues that the ALJ failed to assess her severe morbid obesity, sleep apnea, pain and the affect the combination of these impairments has on her ability to function "on a regular and continuing basis" as promulgated under SSR 96-8p.[14] (Document No. 16 at 12.) An RFC determination is based "on all the relevant evidence in [the] case record", which includes "relevant medical and other evidence" as well as "statements about what [the claimant] can still do", "descriptions and observations of [the claimant's] limitations . . . provided by [the claimant] . . . [.]" See 20 C.F.R. §§ 404.1545(a)(1), (a)(3), 416.945(a)(1), (a)(3). A medical opinion is not necessary in formulating a claimant's RFC, however, the Regulations and controlling case law are clear that the Commissioner is obligated to consider "all" the evidence in the record. Colvard v. Chater, 59 F.3d 165 (4th Cir. 1995) ("The determination of a claimant's [RFC] lies with the ALJ, not a physician, and is based upon all relevant evidence.")

As noted *supra*, the ALJ provided a detailed analysis of both the externally and internally conflicting evidence of record, as well as a discussion of the evidence justifying the RFC assessment. Further, despite Claimant's contention that the ALJ formulated her RFC assessment without considering her ability to engage in substantial gainful activity on a regular and continuing basis, eight hours per day and five days per week, it is clear from the record that this was simply not the case. With regard to Claimant's assertion that the ALJ only mentioned her obesity "in passing", again, the undersigned **FINDS** this argument lacks merit. The ALJ mentions Claimant's obesity no less than eleven times in his decision (Tr. at 19, 20, 23, 24, 25.), and further expressly

---

[14] See "Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims", SSR 96-8p, 1996 WL 374184, at *1-2.

stated that he considered Claimant's obesity under SSR 02-1p[15], finding that "none of the claimant's treating or examining physicians of record has reported any of the necessary clinical, laboratory, or radiographic findings specified" reached listing-level severity. (Tr. at 23.)

The ALJ further noted that "the evidence does not reveal an inability to ambulate effectively", and that Claimant testified that her doctors "always talked to her about her weight and that the weight aggravated her back." (Tr. at 23, 24.) Ultimately, the ALJ determined that as Claimant's Body Mass Index (BMI) "has been in the obese range and recorded as 51, 52.08, and 52.6, with the obesity being described as morbidly obese", "[s]uch objective findings render the claimant's reports partially credible and support limitations to sedentary work with additional non-exertional limitations." (Tr. at 24.) In short, the ALJ herein provided ample evidence in support of the RFC assessment with respect to Claimant's impairments, and even gave her "the benefit of the doubt" not only with regard to her obesity, but also with respect to her "additional non-exertional limitations" and therefore limited her to sedentary work. (Tr. at 25.)

The ALJ supported his findings and conclusions by specific citations to the evidence of record, and therefore supported by substantial evidence. See, generally, Richardson v. Perales, 402 U.S. 389, 390 (1971) ("The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Additionally, the ALJ's written decision indicates that his explanations sufficiently meet the Fourth Circuit standard under Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986) and Hammond v. Heckler, 765 F.2d 424 (4th Cir. 1985). It is apparent that not only did the ALJ comply with SSR

---

[15] See "Titles II and XVI: Evaluation of Obesity", SSR 02-1p, 2002 WL 3468281.

69-8p, but also with SSR 02-1p, with regard to Claimant's impairments, both severe and nonsevere, including her obesity.

Accordingly, the undersigned **FINDS** the ALJ's findings and conclusions related to his assessment of the RFC are supported by the substantial evidence. The undersigned further **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's applications for benefits is supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (Document No. 16.), **GRANT** the Defendant's request to affirm the final decision (Document No. 17.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: September 15, 2017.

Omar J. Aboulhosn
United States Magistrate Judge